IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| SHARON OSBURN, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
|     v. | ) | 2:12cv349-MHT |
| | ) | (WO) |
| CHUCK HAGEL, Secretary, | ) | |
| Department of Defense, | ) | |
| (Defense Information | ) | |
| Systems Agency), | ) | |
| | ) | |
|     Defendant. | ) | |

OPINION AND ORDER

Plaintiff Sharon Osburn brought this lawsuit against defendant Secretary of the Department of Defense claiming sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a & 2000e through 2000e-17. Subject-matter jurisdiction is proper under 42 U.S.C. § 2000e-5(f)(3). The cause is before the court on the Defense Secretary's motion for summary judgment. The motion will be denied in part.

## I. SUMMARY-JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## II. BACKGROUND

Osburn alleges that, while she worked at the Defense Information Systems Agency ("DISA"), her first-line supervisor, Tim Tarver, subjected her to an array of sexual harassment, including raping her on five

2

occasions.   The facts that follow are drawn from the evidence taken in the light most favorable to Osburn.

Osburn began at DISA as a contract employee in 2005. She was formally hired by the agency as an Information Technology Specialist in February 2007.

Tarver's harassment of Osburn started several months after her employment by DISA.   He would make sexual comments to her.   He frequently visited her desk and called her into his office.   Coworkers observed this behavior and expressed concern to Osburn.   By late 2007, Tarver   dialed-up the harassment.   He began touching Osburn, patting her buttocks and touching her breasts. He told her he would help her with her career and immediately followed-up with sexual comments to her.   He also told her that if she said anything he would ruin her career.

On one occasion, when Osburn stayed late, Tarver stayed at work and cornered her in the office.   She was able to convince him to let her leave.   Another night, he

again stayed late, apparently hoping to corner her, but, at her request, a co-worker stayed late as well.  Tarver would drive by Osburn's house when she was home alone, and one night he came to her door uninvited.  He also continued to touch her and make sexual comments at work.

At the end of January 2008, Tarver raped Osburn.  He called her into his office, locked the door, forcibly performed oral sex on her, and then had intercourse with her.  He apologized and promised not to do it again.  However, he raped her in his office three more times in the months that followed.  In July 2009, he raped her for the fifth and final time while they were on a work trip.

In October 2009, Osburn approached her second-line supervisor, Bib Richert, and told him Tarver was sexually harassing her.  She did not tell him about the rapes because she felt too embarrassed.  Because Richart was planning to retire soon, he told her to contact Allison Stafford, an Equal Employment Opportunity ("EEO") specialist.  Osburn tried to contact Stafford several

times but could not reach her and did not leave a message.

In November 2009, Osburn complained to Dan Raney, who was assuming Richart's position. She told him that Tarver had made sexual advances and mistreated her. Raney advised Osburn to go to human resources. A short time later, Osburn again complained to Raney about Tarver. Raney did not take any other steps.

Tarver continued to grope Osburn and make sexual comments to her. He also continued to try to arrange for work trips with her, but Raney would cancel those trips. Tarver criticized Osburn in front of co-workers, tried to move her out of her supervisory position, and required her to write a useless report. On April 16, 2010, after Osburn had complained to Raney, Tarver yelled at Osburn in front of her co-workers and ordered her to stay out of Raney's office.

Osburn decided to report everything. She contacted EEO Specialist Stafford and told her that Tarver had

5

raped her.  Stafford told her not to come into work, but set up a time to meet her off site.  Tarver called her numerous times in the days that followed, asking her not to proceed with her complaint.[1]

Osburn was placed on administrative leave until May 7, 2010.  At that time, she was reassigned to a non-supervisory position.  She was given two options: work from home three days a week and work the other two in the same building as Tarver; or work five days a week in an isolated location.  She asked for Tarver to be moved instead or for DISA to allow her to transfer to Huntsville, Alabama, but the agency refused.  She moved to the fourth floor of the building where her previous office was located.  She was not allowed access to areas that her co-workers could access.

Osburn was evaluated and diagnosed with posttraumatic stress disorder.  Her doctor determined that she would be

---

1. Osburn states in her brief that Tarver was convicted of harassing communications arising out of this conduct.  However, her citations to the record do not support that assertion.

6

unable to return to work because of her symptoms.  She submitted an application to the Department of Labor for worker's compensation benefits.  DISA opposed the application, and the Department of Labor denied benefits.

Osburn did not return to work at DISA.  On August 15, 2011, citing her extended and indefinite absence, DISA terminated Osburn.  Osburn brought this lawsuit against the Secretary of Defense.


## III. DISCUSSION

Title VII bars an employer from discriminating against an employee "because of ... sex." 42 U.S.C.2000e-2 (a)(1).  This provision "prohibits sex-based discrimination that alters the terms and conditions of employment."  Baldwin v. Blue Cross/Blue Shield of Alabama, 480 F.3d 1287, 1300 (11th Cir. 2007). Title VII also prohibits retaliation against an employee because she opposed "an unlawful employment practice." 42 U.S.C. § 2000e-3(a).  Osburn alleges both sexual

7

harassment and retaliation, and the Defense Secretary seeks summary judgment in his favor on each claim.

## A.  Sex Discrimination

An employee can establish a sex-based violation against an employer in either of two ways: (1) "through tangible employment action" or (2) "through creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of the work." Nurse "BE" v. Columbia Palms W. Hosp. Ltd. P'ship, 490 F.3d 1302, 1308 (11th Cir. 2007).

Osburn has sought to establish a violation through both theories, tangible-employment action and hostile-work environment.

## 1. Tangible-Employment Action

A tangible-employment action is "'a significant change in employment status, such as hiring, firing,

8

failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" <u>Vance v. Ball State Univ.</u>, 133 S. Ct. 2434, 2442 (2013) (quoting <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998)). As a general rule, "[t]angible employment actions fall within the special province of the supervisor," and, as such, there is rarely a question of vicarious liability for the company. <u>Ellerth</u>, 524 U.S. at 762. A company has no affirmative defense where there has been a tangible-employment action. <u>Id</u>. at 765.

To establish the Defense Secretary's liability under a tangible-employment-action theory, Osburn must first prove that there was a tangible-employment action. <u>Minix v. Jeld-Wen, Inc.</u>, 2006 WL 2971654, at *3 (M.D. Ala. 2006)(Thompson, J.) <u>aff'd</u>, 237 F. App'x 578 (11th Cir. 2007). The Secretary argues that Osburn has failed to establish that Tarver ever took any such action against Osburn.  The court agrees.

9

Osburn first points to testimony indicating that Tarver was compiling a record of Osburn's alleged job performance problems at the time she made her complaint. See, e.g., Tarver Polygraph (Doc. No. 138-2) at 15 (stating he "had pages of documentation" and "was gonna do something formal" when Osburn reported the instant allegations). But the fact that Tarver may have been planning to take a tangible-employment action does not establish that he actually did so. See Ellerth, 524 U.S. at 754 (1998) ("Because Ellerth's claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct."); cf. Faragher v. City of Boca Raton, 524 U.S. 775, 808 (1998) ("No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.") (emphasis added). The record indicates

10

that no action was taken against Osburn based on the documentation Tarver had gathered.

Next, Osburn points out that Tarver would criticize her to other employees, allegedly because he was angry that she had rejected his sexual advances. This conduct, if true, certainly constitutes sexual harassment. But it does not fall within the definition of tangible-employment action. See Ellerth, 524 U.S. at 761 ("a 'bruised ego' is not enough") (citation omitted); id. at 762 ("A tangible employment action in most cases inflicts direct economic harm."); Arnold v. Tuskegee Univ., 212 F. App'x 803, 808 (11th Cir. 2006) (supervisor "yelling at [plaintiff and] telling her to find another job" was not tangible-employment action). While, conceivably, criticism could lead to economic harm under some circumstances, there has been no showing that it did so in this case.

Finally, Osburn argues that she received lower bonuses when compared to those of other supervisors who

11

worked under Tarver. However, she has failed to establish that was actually the case. The following exchange at her deposition provides the strongest support:

> "Q. And what types of payouts did you yourself receive?
>
> "A. The lowest you can get, 60 percent raise, 40 percent bonus but tax -- tax bonus.
>
> "Q. And how much do you believe the other supervisors were getting?
> "A. Some of them got 80 percent raises with 20 percent payout bonus.
>
> "Q. And how do you know that?
>
> "A. Because they told me."

Osburn Dep. Vol. II (Doc. No. 131-7) at 15. Osburn's only basis for comparison, namely what the other supervisors told her, is hearsay, and she has not explained how it can be reduced to admissible form. See Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005). She has not introduced, for example, testimony from those other supervisors or documentary evidence

indicating that she was given lower bonus amounts. On this record, Osburn has simply failed to establish any tangible-employment action.

## 2. Hostile-Work Environment

Even where there is no tangible-employment action, an employer can still be held liable for its employees' actions. To establish a prima-facie case of hostile-work environment "a plaintiff must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists." See Hulsey v. Pride Rest., LLC, 367 F.3d 1238, 1244 (11th Cir. 2004).

The Defense Secretary argues that Osburn has failed to establish the second element, that Tarver's conduct

13

was 'unwelcome.'  He also argues that, even if Tarver
harassed Osburn, Osburn has failed to establish the fifth
element, vicarious liability, for two reasons: (a) Tarver
was  not  Osburn's  supervisor  and  (b)  the  agency  is
entitled to the <u>Faragher</u>/<u>Ellerth</u> affirmative defense.


### a.   Unwelcome Conduct

The  Defense  Secretary  first  argues  that  Osburn's
harassment claim fails because she did not establish that
Tarver's conduct was 'unwelcome.'  <u>See</u> <u>Hulsey</u>, 367 F.3d
at  1244.   He  argues  that  the  sexual  contact  between
Osburn  and  Tarver  was  entirely  consensual.   He  states
that  Osburn  "has  provided  no  evidence,  beyond  her  bare
and  often  contradictory  assertions,  to  support  her  claim
that  Tarver's  behavior  was  unwelcomed,"  and  argues  that
her  "'after-the-fact'"  statements  alone  are  insufficient
to  survive  summary  judgment.  Dft. Br. Summ. Judgt. (Doc.
No. 134) at 27 (quoting <u>Souther v. Posen Const., Inc.</u>,
523 F. App'x 352, 355 (6th Cir. 2013)).

However, in reality, Osburn has offered significantly more than bare assertions to corroborate her version of events. <u>Souther</u>, 523 F. App'x at 355 (internal quotation marks omitted). Indeed, unlike <u>Souther</u>, in this case Osburn has submitted, in addition to her sworn testimony, corroborating evidence that she complained to others during the course of the alleged harassment. <u>See, e.g.</u>, Garrison Affidavit (Doc. No. 138-10) (co-worker describing both his own observations and statements Osburn made to him about Tarver); Lewis Affidavit (Doc. No. 138-11) (same); Padgett Affidavit (Doc. No. 138-12) (same). For example, one co-worker indicated in a sworn statement that he observed Tarver making "inappropriate" comments about Osburn's appearance, comments which clearly "bothered her" and left her looking "very uncomfortable after his visits." Garrison Affidavit (Doc. No. 138-10) at 3. The co-worker stated that Osburn also repeatedly told him that Tarver commented on her appearance and body, and touched her inappropriately.

<u>Id</u>. at 4.  The co-worker observed that Osburn was "down, depressed, emotionally stressed and overall troubled," and that "[n]ot once did she seem pleased, happy, or relieved after visiting [Tarver's] office."  <u>Id</u>. at 4. To say the least, these accounts, taken in the light most favorable to Osburn, do not suggest a welcomed and consensual sexual relationship.

Certainly, there is also evidence that tends to undermine Osburn's version of events.  Tarver himself stated that all of the sexual conduct was consensual even though he admitted that on at least one occasion she said "no."[2]  What Osburn meant by "no," and whether it was

_____

2.  In her brief, Osburn states that Tarver admitted, during the course of a polygraph examination, that he "coerced Osburn to have sex with him."  Pf. Opp. Br. Summ. Judgt. (Doc. No. 139) at 16.  It is true that Tarver said that he coerced sex during the trip in Ohio. <u>See</u> Polygraph transcript (Doc. No. 138-2) at 233 ("Has there been times where she said no we shouldn't be doing this, but you still coerced her into engaging in sex? Tarver: Yes.").  Tarver, however, argues that this statement is taken out of context and that the sex was consensual.

He states that what he meant by coercion is that she
(continued...)

sincere or playful, is for the jury to decide. Moreover, that she also did not say "yes" is a fact to be considered by the jury in deciding whether the sex was coerced. Cf. Nicholas J. Little, Note, From No Means No to Only Yes Means Yes: The Rational Results of an Affirmative Consent Standard in Rape Law, 58 Vand. L. Rev. 1321, 1323 (2005) (arguing that rape law should assume no consent unless it is affirmatively given); Dana Berliner, Rethinking the Reasonable Belief Defense to Rape, 100 Yale L.J. 2687, 2703 (1991)(arguing that

---

2(...continued)
told him "no, we don't need to be doing this," and he insisted. Id. at 234. He contends that this was said playfully, and she then actively and voluntarily participated in the sexual contact. He stated: "I never forced her to do it. She could have told me no, not tonight, I'm not gonna do this anymore and I would have left." Id. at 239-240. His argument is that Osburn's initial "no" and his rejoinder were merely playful banter and that he would have stopped had she subsequently said "no."

Of course, Tarver may not have been truthful in his polygraph examination; indeed, for the purposes of summary judgment, the court must assume he was not because his account of these events is so dramatically different from Osburn's.

requiring affirmative consent would lead to negative consequences); Ian Lovett, California Bill Sets Sights on Curbing Campus Sexual Assaults, N.Y. Times, Sept. 11, 2014, at A16, available at http://www.nytimes.com/2014/09/11/us/california-bill-sets-sights-on-curbing-campus-sex-assaults.html (reporting on California bill requiring that universities receiving state funds mandate verbal or nonverbal affirmative consent for sexual activity as part of their sexual assault policies); The Antioch College Sexual Offense Policy, available at www.mit.edu/activities/safe/data/other/antioch-code (old sexual assault policy from Antioch college that required affirmative consent at all stages of sexual conduct and sparked a nationwide debate on consent).

The Secretary cites other testimony and evidence that casts doubt on Osburn's account, including testimony that Osburn flirted with Tarver in public. But the existence of conflicting evidence does not establish, as a matter

18

of undisputed fact, that the sexual conduct was 'welcomed.' On the contrary, it appears the Secretary is inviting the court to discount Osburn's versions of events, which is at least in part corroborated by other witnesses, based on a suggested negative determination regarding her credibility. To do so would be inappropriate at summary judgment. <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1316 (11th Cir. 2001).[3]  The court finds that, with the evidence considered in the light most favorable to Osburn, she has established unwelcome sexual harassment.

---

3. The court notes that the dark history of the treatment of victims of sexual assault in court proceedings lurks behind cases such as this one. There was a time not long ago when courts and legal scholars viewed allegations of rape with automatic suspicion, and judges instructed juries accordingly. <u>See</u> Tera Jckowski Peterson, <u>Distrust and Discovery: The Impending Debacle in Discovery of Rape Victims' Counseling Records in Utah</u>, 2001 Utah L. Rev. 695 (2001). By and large those days are now past, but courts must be vigilant to ensure that such prejudices do not infect cases like this one.

19

### b.  Vicarious Liability

The remaining issue is whether the Secretary, as head of the Department of Defense, of which DISA is a component, is liable for Tarver's harassment.  The Supreme Court recently reviewed the range of possibilities for employer liability in harassment cases:

> "Under Title VII, an employer's liability for such harassment may depend on the status of the harasser.  If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.  In cases in which the harasser is a 'supervisor,' however, different rules apply.  If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.  But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided."

Vance, 133 S. Ct. at 2439.

20

As set forth in <u>Vance</u>, Osburn may establish the Defense Secretary's vicarious liability for Tarver's conduct in either of two ways. Both require the court to find that Tarver was Osburn's 'supervisor,' as that term was interpreted in <u>Vance</u>. First, if Osburn can establish a tangible-employment-action violation, then the Secretary is strictly liable. Second, if Osburn can establish a hostile-work-environment violation, then he is vicariously liable unless he can show he is entitled to the applicable affirmative defense. If Osburn cannot establish any basis for vicarious liability, the Secretary could still be held liable on a negligence theory based on co-worker harassment. <u>Vance</u>, 133 S. Ct. at 2451. However, Osburn has not sought to establish negligence in this case.

The Defense Secretary makes two arguments against vicarious liability: first, that Tarver was not Osburn's

supervisor; and, second, that he has established the affirmative defense.[4]

_____

4. The Defense Secretary has made no argument that, if Osburn's account of events is true, Tarver did not alter the terms or conditions of employment by creating a hostile-work environment. In addressing that claim, courts look to four factors: "'(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.'" Walton v. Johnson & Johnson Servs., Inc., 347 F.3d 1272, 1285 n.12 (11th Cir. 2003) (quoting Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc)). The court "must then decide, looking at the totality of the circumstances, 'whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.'" Walton, 347 F.3d at 1285 n.12 (quoting Mendoza, 195 F.3d at 1246).

This court "can think of few incidents, isolated or not, that are more serious than those alleged to have occurred in this case." Walton, 347 F.3d at 1285 n.12. Therefore, with the evidence viewed in the light most favorable to Osburn, Tarver's conduct, including "fondling and sexual assault," is "sufficient to create a sexually hostile and abusive work environment that altered the terms and conditions of [Osburn's] employment." Id.

### i. Supervisor

The Defense Secretary first argues that Tarver did not qualify as Osburn's 'supervisor' as that term was recently defined in <u>Vance</u>.  If the court were to accept that argument, he could not be held vicariously liable for Tarver's conduct on either theory discussed above.  However, the court finds that there is a genuine dispute of material fact on this issue.

The Supreme Court established the current regime for determining employer's vicarious liability under Title VII in a pair of 1998 cases: <u>Faragher</u> and <u>Ellerth</u>.  However, just last year, the Court resolved "a question left open" in <u>Faragher</u> and <u>Ellerth</u>: "who qualifies as a 'supervisor' in a case in which an employee asserts a Title VII claim for workplace harassment?"  <u>Vance</u>, 133 S.Ct. at 2439.  The Court rejected an understanding of the term 'supervisor' that would require only "the ability to exercise significant direction over another's daily work," and instead held that an employee is a

supervisor "when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  Id. at 2443 (quoting Ellerth, 524 U.S. at 761).

The Defense Secretary argues that, although Tarver's title and job description both indicated he was Osburn's supervisor, Tarver does not qualify as one under Vance. Specifically, he has offered evidence that first-line supervisor Tarver did not have the authority to take any of the actions specified in Vance.  In the Secretary's view, this evidence establishes that only the second- and third-line supervisors were 'supervisors' for the purposes of Title VII.

In Vance, the Supreme Court emphasized the need for a simple and administrable definition of 'supervisor.'

**24**

But the Court's understanding of that term was not without nuance. The Court did not, for example, hold that only an individual in whom the official, formal authority to hire, fire, and take other tangible employment actions would qualify as a supervisor. On the contrary, the Court repeatedly emphasized that the important questions were practical ones.

For example, in considering the implications of the definition it adopted, the Court found that, "even if an employer concentrates all decisionmaking authority in a few individuals, it likely will not isolate itself from [vicarious] liability" because, in that instance, "those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee." Vance, 133 S.Ct. at 2452. The Court then approvingly drew upon a concurring opinion in a Seventh Circuit case: "'Although they did not have the power to take formal employment actions vis-à-vis [the

25

victim], [the harassers] necessarily must have had substantial input into those decisions, as they would have been the people most familiar with her work-- certainly more familiar with it than the off-site ... Manager.'" <u>Id</u>. (quoting <u>Rhodes v. Illinois Dept. of Transp.,</u> 359 F.3d 498, 509 (7th Cir. 2004) (Rovner, J., concurring in part and concurring in the judgment) (internal quotation marks omitted)). "Under those circumstances, the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." <u>Id</u>. In other words, the Court expressly anticipated that individuals who did <u>not</u> have formal authority would wield effective power to take tangible-employment actions. It also strongly suggested that even substantial input into such decisions might well qualify an individual as a supervisor.

The Court struck a similar tone in discussing how the adopted definition squared with the Court's prior

26

holdings in _Faragher_ and _Ellerth_.  The Court had treated
the harassers in those cases as supervisors, and the
plaintiff in _Vance_ argued that they would not qualify as
such under the Court's new definition.  In response to
this argument, the Court noted that the issue of whether
the harassers were supervisors had not been raised in
either prior case but found that the harassers in those
cases would (or, in one case, might) qualify as
supervisors.  In considering _Ellerth_, the Court noted
that the harasser had hired the victim, and that "he
promoted her (subject only to the ministerial approval of
his supervisor, who merely signed the paperwork)."
_Vance_, 133 S.Ct. at 2446.  This indicates, at least, that
the fact of formal authority vesting in one person does
not preclude another from qualifying as a supervisor.

But the Court's discussion of _Faragher_ was starker:
the Court found it was "clear" that one harasser, "had
authority to take tangible employment actions affecting
the victim" based on the fact that "no one ... was hired

**27**

without his <u>recommendation</u>"; that he "<u>initiated</u> firing and suspending personnel"; that his "<u>evaluations</u> ... translated into salary increases"; and that he "made <u>recommendations</u> regarding promotions." <u>Id</u>. at 2446, 2446 n.8 (emphasis added, internal quotation marks omitted). As to the other harasser in that case, the Court indicated that he "might" qualify as a supervisor based on his "disciplinary decisions and ... input on ... evaluations" if those actions had "economic consequences." <u>Id</u>. at 2447 n.9. Similarly, if his assignment of different responsibilities had "economic consequences," for example by "foreclosing ... eligibility for a promotion," then, again, he "might" qualify as a supervisor.

Taken together, the Court's point is clear: supervisors are not limited to those who have a formal, 'on the books' power to take tangible-employment actions. Rather, what the Court sketched in <u>Vance</u> is an approach under which "[a] manager who works closely with his or

28

her subordinates and who has the power to recommend or otherwise substantially influence tangible employment actions, and who can thus indirectly effectuate them, also qualifies as a 'supervisor' under Title VII." Kramer v. Wasatch Cnty. Sheriff's Office, 743 F.3d 726, 738 (10th Cir. 2014) (emphasis omitted).

In light of this understanding, the evidence to which the Defense Secretary points is unpersuasive. In support of his motion for summary judgment, the Secretary introduced a series of affidavits that each state, nearly word-for-word, that Tarver "did not have the authority to take tangible employment actions against Ms. Osburn, that is, [he] did not have the authority to make significant changes in her employment status, such as hiring, firing, failing to promote, reassigning her to significantly different responsibilities, or making a decision causing a significant change in her benefits." Tarver Affidavit (Doc. No. 131-14) at 2-3; see also Richert Affidavit (Doc. No. 131-15) at 2-3 (Tarver did not have authority

29

to "unilaterally" make such changes); Raney Affidavit
(Doc. No. 131-16) at 2-3 (same); Dingler Affidavit (Doc.
No. 131-17) at 2-3 (same). As explained above, the mere
fact that Tarver could not take these actions is not
dispositive. The affidavits also purport to establish
that the authority to take the specified actions was
vested with Tarver's superiors and that he could not
"unilaterally" take action against Osburn.   Richert
Affidavit (Doc. No. 131-15) at 2.   But these affidavits
do <u>not</u> establish that Tarver had no "power to recommend
or otherwise substantially influence tangible employment
actions [and] thus indirectly effectuate them," <u>Kramer</u>,
743 F.3d at 738, as contemplated by <u>Vance</u>.[5]

The Secretary argues, though, that Osburn has not
come forward with any evidence that Tarver does qualify
as a supervisor.   The court finds otherwise.   Tarver's

---

    5. The Secretary also points to deposition testimony
in which Osburn acknowledged that Tarver did not have the
authority to reassign her.   <u>See</u> Osburn Dep. Vol. I (Doc.
No. 131-1) at 55.   Obviously, this bears on only
transfers and does not address what other authority
Tarver might have.

job description, for example, provides that among his
"major duties" was "supervising employees," and, among
other things, his job involved "evaluat[ing] work
performance of subordinates" and "mak[ing] selections for
promotions and reassignments."  DISA Position Description
(Doc. No. 138-13) at 3-4.  Furthermore, Tarver described
his own involvement in overseeing Osburn in terms that
echo the conduct that the Supreme Court indicated did or
might qualify as 'supervisory': Tarver was responsible
for Osburn's performance evaluations, see Tarver Dep.
(Doc. No. 138-1) at 14, 37-38, Tarver Affidavit (Doc. No.
131-14) at 3; and he was empowered to recommend both
discipline, see Tarver Dep. (Doc. No. 138-1) at 16, as
well as salary increases, awards, and bonuses, see Tarver
Affidavit (Doc. No. 131-14) at 3.  It is clear from both
his statements and Osburn's that, of Osburn's
supervisors, it was Tarver who worked with Osburn most
closely on a day-to-day basis.  Considering this evidence
in the light most favorable to Osburn, a jury could

31

conclude that Tarver was a "manager who work[ed] closely with [Osburn] and who ha[d] the power to recommend or otherwise substantially influence tangible employment actions, and who c[ould] thus indirectly effectuate them." Kramer, 743 F.3d at 738. The Secretary is, therefore, not entitled to summary judgment on this basis.

### ii. Faragher/Ellerth affirmative defense

The Defense Secretary next invokes the Faragher/Ellerth affirmative defense. "An employer avoids liability under this defense if: 1) it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior'; and 2) the employee 'unreasonably failed to take advantage of any preventative or corrective opportunities [it] provided.'" Nurse "BE" v. Columbia Palms W. Hosp. Ltd. P'ship, 490 F.3d 1302, 1308-09 (11th Cir. 2007) (quoting Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765). "As an

affirmative defense, the defendant bears the burden of establishing both of these elements." <u>Nurse "BE"</u>, 490 F.3d at 1309.

The first prong of the affirmative defense is that the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." <u>Nurse "BE"</u>, 490 F.3d at 1308 (internal quotation marks omitted). This prong really has two parts: reasonable care to prevent harassment, and reasonable care promptly to correct harassment once it has been identified. <u>See</u> <u>Frederick</u>, 246 F.3d at 1313.

The Defense Secretary argues that DISA took reasonable care to prevent harassment by promulgating a series of sexual-harassment policies.[6] In order to carry his burden, he must show that the polices were "effectively published, that [they] contained reasonable

------

6. Osburn moved to strike or disregard most of the policies based on alleged discovery violations. In a separate opinion and order, the court has denied that motion.

33

complaint procedures, and that [they] contained no other fatal defect." Id. at 1314.

The Secretary argues that the polices were effectively published. In support, he offers copies of the policies, see Policies (doc. no. 131-12), and affidavits indicating that the policies were published on a bulletin board outside of Osburn's office, as well as on the agency's internal network and external website.[7] Osburn, however, denies seeing any such policy. See Osburn Dep. Vol. I (Doc. No. 131-1) at 11. Certainly, the Secretary has offered evidence to suggest that Osburn's testimony is not true; but "[t]he summary judgment standard require[s]" this court to "credit [Osburn's] testimony."[8] Frederick, 246 F.3d at 1315

_____

7. The Secretary also introduced evidence that the EEO process was addressed at a new employee orientation which Osburn attended. In a separate opinion and order, the court found that the evidence regarding what topics were discussed at the orientation should be disregarded.

8. The Secretary introduced evidence that Osburn attended a training in February 2009, at which the harassment policy was discussed. See Stafford Affidavit
(continued...)

34

(reversing district court's grant of summary judgment to the employer based on the Faragher/Ellerth affirmative defense, in part based on the district court's failure to credit the plaintiff's testimony that she did not receive harassment policy); see also id. at 1316 ("assessments of witness credibility ... by definition cannot be resolved at summary judgment").  He has not offered a sufficient basis to conclude, when considering the evidence in the light most favorable to Osburn, that these policies were effectively published. Therefore, the court finds there is a genuine dispute of material fact on this issue.

Genuine disputes also prevent the court from concluding that DISA promptly took reasonable care to correct harassment once it had been identified.   The

---

8(...continued)
(Doc. No. 131-13); Sign-in Sheet (Doc. No. 144-6).
Osburn objects to this evidence on evidentiary grounds.
However, even if the evidence is reducible to admissible
form and establishes that Osburn attended the training,
it remains true that the Secretary has failed to show the
policies were effectively published.  After all, Osburn
claims Tarver was harassing her by mid-2007, nearly two
years before the disputed training.

35

Secretary's burden is to establish that DISA "acted reasonably promptly on [Osburn's] complaint when it was given proper notice of her allegations as required under its complaint procedures." Frederick, 246 F.3d at 1314. Those policies indicate that employees could report harassment within their own chain of command as an alternative to reporting harassment to the EEO or human resources offices. See Policies (Doc. No. 131-12) at 4 ("the individual should report the incident to the appropriate supervisor and via internal chain of command and/or to their local servicing EEO office"); id. at 6 ("you may contact any member of the DISA Management Team for assistance"); id. at 10 (same). The policies elaborated that "[o]nce a supervisor is informed of an incident of alleged sexual harassment, the supervisor will immediately inform and consult with the DISA EEO office." Id. at 5. "With th[ese] polic[ies], [DISA] itself answered the question of when it would be deemed to have notice of the harassment sufficient to obligate

36

it or its agents to take prompt and appropriate remedial measures." <u>Coates v. Sundor Brands, Inc.</u>, 164 F.3d 1361, 1364 (11th Cir. 1999).

According to Osburn's testimony, when she reported to her second-line supervisors that Tarver was sexually harassing her, they referred her elsewhere and took no action themselves. <u>See</u> Osburn Dep. Vol. I (Doc. No. 131-1) at 19 (Osburn reported sexual harassment to Richert in October 2009, and Richert told her that she "need[ed] to watch [her] back" and that she should "contact [EEO Specialist] Allison [Stafford]"); <u>id.</u> (Osburn reported sexual harassment to Raney in November 2009, and he told her that if she "felt [she] had been harassed or worse, [she needed] to ... document [her] actions and go to [Human Resources]").[9] They not only failed <u>immediately</u> to inform an EEO specialist, as required by the policies, but also never informed an EEO specialist <u>at all</u>. Not

_____

9. The fact that the supervisors deny that Osburn reported sexual harassment, <u>see</u> Richert Affidavit (Doc. No. 131-15); Raney Affidavit (Doc. No. 131-16), simply means there is a genuine dispute on that issue.

37

until six months later, when Osburn contacted an EEO
specialist, did DISA take any action.[10]  This tardy action
well after Osburn informed the supervisors clearly does
not meet DISA's own policy. Taking the evidence in the
light most favorable to Osburn, the Defense Secretary has
therefore failed to establish DISA acted reasonably
promptly upon receiving Osburn's complaint.[11]

Because the court has concluded that genuine disputes
of material fact preclude a finding for the Secretary on
the first prong of the affirmative defense, that DISA

_____

10. The Secretary argues that Richert and Raney did
take action: they told Osburn to talk to someone else.
Once again, the court may look to DISA's own policies for
guidance, see Coates, 164 F.3d at 1364, and the policies
required immediate notification of an EEO specialist,
Policies (Doc. No. 131-12) at 5.  According to Osburn's
version of events, her supervisors did not do so.  Thus,
their advice to Osburn to talk to someone else is
insufficient to establish that DISA took reasonable care
to promptly correct the harassment.

11. Osburn contends that DISA's response was also
inadequate because its remedy--namely her transfer--left
her in a worse position.  This transfer will be discussed
in the retaliation section below. Given the material
disputes already identified for the sex discrimination
claim, the court need not resolve the adequacy of DISA's
remedial measures here.

38

exercised reasonable care to prevent and correct the behavior, the court need not reach the second prong, that Osburn failed to take advantage of such corrective measures. See Nurse "BE", 490 F.3d at 1309 ("As an affirmative defense, the defendant bears the burden of establishing both ... elements.").

In summary, because a jury could conclude that Tarver was Osburn's supervisor, as defined in Vance; that Osburn was subjected to a hostile-work environment; and that DISA failed to take reasonable care to prevent harassment, summary judgment on Osburn's sex discrimination claim will be denied.


## B. Retaliation

"Title VII prohibits not only discrimination, but retaliation against an employee because she 'has opposed any practice made an unlawful employment practice by Title VII.'" Kidd v. Mando Am. Corp., 731 F.3d 1196, 1211 (11th Cir. 2013) (quoting Crawford v. Carroll, 529

F.3d 961, 970 (11th Cir. 2008)).  The parties agree that the <u>McDonnell Douglas</u> burden-shifting framework applies to this case.  <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802–05 (1973).  Once a plaintiff establishes a prima-facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-retaliatory and non-discriminatory reason for the adverse employment action. <u>Brown v. Alabama Dep't of Transp.</u>, 597 F.3d 1160, 1181 (11th Cir. 2010).  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and drops from the case."  <u>Id</u>.  After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext to cover up a retaliatory or discriminatory action.  <u>Id</u>. at 1181-82.

In this case, Osburn has pointed to the following allegedly retaliatory conduct: (1) her transfer to a non-

supervisory position in isolated conditions; (2) her
constructive discharge; and (3) DISA's opposition to her
application for worker's compensation benefits.[12]   The
Secretary argues that Osburn has failed to establish a
prima-facie case as to each and that in any event she has

_____

12. In her brief, Osburn also points to a narrative
she submitted as an exhibit to her opposition to the
Secretary's motion for summary judgment, claiming it
contains "a detailed timeline of events which constitute
retaliatory harassment."  Pf. Opp. Br. Summ. Judgt. (Doc.
No. 139) at 60.  The statement, which is 15 pages long
and single spaced, discusses the events following her
report to EEO Specialist Stafford in great detail,
including events that could not possibly constitute
retaliation.  See, e.g., Osburn Statement (Doc. No. 138-
26) at 5 ("Mike took Rocky to doggie day care.").  Osburn
fails to explain which of those events she considers to
be retaliation.  See Fed. R. Civ. P. 56(c)(1) ("A party
asserting that a fact cannot be or is genuinely disputed
must support the assertion by ... citing to particular
parts of materials in the record") (emphasis added).
Furthermore, the statement appears not to be sworn or
made under penalty of perjury.  See Carr v. Tatangelo,
338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (document
submitted "without attestation" had "no probative value"
and was properly disregarded at summary judgment).  The
court has therefore considered only the specific
retaliatory actions Osburn alleged, as described above,
and not the nonspecific timeline of purportedly
retaliatory events.

failed to show that his non-retaliatory reasons are pretextual.


## 1. Transfer

Osburn first argues that her transfer to a non-supervisory position in isolated conditions was unlawful retaliation.

"To make out a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in an activity protected under Title VII; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action." Kidd, 731 F.3d at 1211 (citing Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1258 (11th Cir. 2012)). The Defense Secretary does not dispute that Osburn satisfied the first prong by filing her EEO complaint.

An action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. &

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  This standard is "decidedly more relaxed" than the previous requirement for "a serious and material change in the terms, conditions, or privileges of employment." *Crawford*, 529 F.3d at 970-71; 973 (emphasis in original)(internal quotation marks omitted).

As to Osburn's transfer following her EEO complaint, it is undisputed that she did not suffer any loss of pay or benefits. However, Osburn argues that she was stripped of her supervisory duties and was isolated from coworkers, unable to access certain work areas. The Secretary contends that this transfer and isolation allegation does not meet the prima-facie standard for a retaliation case.

It is open to question whether the Secretary is applying *Burlington* or the old standard. *Compare* Def. Br. in Supp. of Summ. Judgt. (Doc. No. 134 at 56)(quoting *Burlington*) *with id.* at 57 ("the conduct must meet some threshold level of substantiality"); Dft. Reply Br. Summ.

Judgmt. (Doc. No. 144)("the employee must present evidence of an objectively serious and material change"). To the extent that he relies on the old substantiality standard, the <u>Burlington</u> Court "effectively rejected" it, and his arguments are thus inapplicable. <u>Crawford</u>, 529 F.3d at 973-74. To the extent he relies the on the <u>Burlington</u> standard, the court finds a genuine dispute of material fact on whether Osburn's transfer and isolation might dissuade a reasonable worker from alleging discrimination.

The Secretary also argues that Osburn has failed to establish the causation prong of the prima-facie case with regard to her transfer.[13] This argument is meritless. It is undisputed that Osburn was transferred as a result of her complaint. <u>See</u> Dft. Br. Summ. Judgt. (Doc. No. 134) at 55 ("When the plaintiff first contacted EEO and

---

13. "The Supreme Court recently held that a plaintiff must demonstrate that his protected activity was the 'but-for' cause of the adverse employment decision." <u>Mealing v. Georgia Dep't of Juvenile Justice</u>, 564 Fed. App'x. 421, 426 (11th Cir. 2014) (quoting <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 133 S.Ct. 2517, 2534 (2013)).

made allegations of harassment ... the Agency's EEO
office immediately initiated actions ... including moving
... the Plaintiff."). Of course, the Secretary contends
that the reasons for Osburn's transfer were not
retaliatory; but he does not, and cannot, deny that
"there was a causal connection between the protected
activity and the adverse action." Kidd, 731 F.3d at
1211. Thus, on either side's version of events, there is
a clear causal connection between the EEO filing and
Osburn's transfer. The court concludes Osburn has
established a prima-facie case with regard to her
transfer.

Because Osburn has established a prima-facie case,
the burden shifts to the Defense Secretary "to rebut the
presumption by producing sufficient evidence to raise a
genuine issue of fact as to whether the employer
[retaliated] against the employee." Hall v. Alabama
Ass'n of Sch. Boards, 326 F.3d 1157, 1166 (11th Cir.
2003) (incorporating opinion of Thompson, J.). "This may

45

be done by the employer articulating a legitimate,
non-[retaliatory] reason for the employment decision,
which is clear, reasonably specific, and worthy of
credence." Id. The burden then shifts back to the
plaintiff: "Once the employer satisfies this burden of
production, the employee then has the burden of
persuading the court that the proffered reason for the
employment decision is a pretext for [retaliation]. The
employee may satisfy this burden either directly, by
persuading the court that a [retaliatory] reason more
than likely motivated the employer, or indirectly, by
persuading the court that the proffered reason for the
employment decision is not worthy of belief. By so
persuading the court, the employee satisfies his ultimate
burden of demonstrating by a preponderance of the
evidence that he has been the victim of unlawful
[retaliation]." Id.

As to Osburn's transfer, which allegedly involved
stripping her of supervisory authority and isolating her

46

from other employees and work areas, the Secretary has carried his "exceedingly light" burden of production. Perryman v. Johnson Products Co., Inc., 698 F.2d 1138, 1142 (11th Cir. 1983).  He submitted an affidavit from Margaret Brasfield, a Human Resources Field Advisor, indicating that Osburn herself requested a transfer. Brasfield Affidavit (Doc. No. 131-75).  Brasfield states that Osburn requested that she be placed under particular supervisors and that Osburn knew such placement would mean that she would no longer have supervisory duties. Id.  As for her isolation, the Secretary submitted an affidavit from Dan Dingler, who was Osburn's third-line supervisor, stating that Osburn was placed on a different floor, to which access was restricted, in order that she could "[feel] safe and could function."  Dingler Affidavit (Doc. No. 131-17) at 3.

However, Osburn has established genuine disputes of material fact regarding the Secretary's account. According to Osburn, she did not request a transfer;

47

rather, she asked only that Tarver be transferred away. See Osburn Dep. Vol. II (Doc. No. 131-7) at 11 ("I requested Tarver be moved. That case, I could stay where I was."). Osburn says she requested a transfer, and specifically a transfer to a particular supervisor, only if Tarver could not be moved. Id. Furthermore, it is undisputed that Tarver was transferred to another building. See Dingler Affidavit (Doc. No. 131-17) at 4. Thus, on Osburn's version of events, and given that Tarver would be gone, she did not request a transfer. And, if a jury were to believe her, that would be a basis to discredit the Secretary's evidence that the reason for her transfer, and the accompanying loss of supervisory duties, was that she requested it. See Osburn Dep. Vol. II (Doc. No. 131-7) at 11 ("I didn't think they would take ... me away from my team because of something he did to me. I requested that he no longer supervise.").

Similarly, Osburn has introduced evidence to rebut the Secretary's suggestion that she was isolated in order

48

to protect her and give her a sense of safety.  First, Osburn denies that she asked to be placed in a safe environment.  Id.  But, furthermore, there is evidence based on which a jury could discount even the perceived need to move Osburn out of safety concerns.  Tarver had been transferred to another building, directed not to enter his prior building, and required to surrender his office keys.  See Dingler Affidavit (Doc. No. 131-17) at 4.  This certainly suggests that Osburn would have been, and would have felt, safe even if she had stayed at her prior office as she wanted to.  The Secretary introduced evidence, though, that the fourth floor, to which Osburn was moved, was more secure: it was restricted, and Tarver did not have access.  Id.  But, again, Osburn contests this reasoning: according to her testimony, "The whole building was locked."  Osburn Dep. Vol. II (Doc. No. 131-7) at 11.[14]

---

14. In his brief, the Secretary states that the transfers were undertaken while official investigations were pending, apparently suggesting that this justified
(continued...)

49

Taken together, Osburn's evidence has cast sufficient doubt on the Defense Secretary's proffered explanations for the transfer that a reasonable jury could disbelieve those reasons. "A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully [retaliated]." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000). In this case, the court concludes that a reasonable jury could, on this record, reasonably conclude that the Secretary's proffered explanations for the transfer were pretextual and that in reality DISA transferred Osburn, took away her supervisory duties, and isolated her in order to retaliate against her for her EEO complaint. Therefore,

_____

14(...continued)
Osburn's isolation. See Dingler Affidavit (Doc. No. 131-17) at 4. Osburn has denied the investigations were ongoing at the time. Osburn Dep. Vol. II (Doc. No. 131-7) at 11.

summary judgment will be denied as to Osburn's retaliation claim based on the transfer.

## 2. Constructive Discharge

In her complaint, Osburn also alleged that DISA constructively discharged her in retaliation for filing her EEO complaint. She makes no such argument in her brief. The court finds that she has abandoned this argument. See Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned").

## 3. Worker's Compensation

Osburn's last allegation is that DISA retaliated against her by opposing her worker's compensation claim. Because the parties did not fully address this issue in their briefing, the court makes no determination on the

issue and, instead, will discuss this issue further with the parties.

***

Accordingly, it is ORDERED that the motion for summary judgment (Doc. No. 131) filed by defendant Chuck Hagel, in his capacity of Secretary of the Department of Defense, is denied in all respects except as to plaintiff Sharon Osburn's claim of retaliatory opposition to her request for worker's compensation. The court reserves ruling at this time on this claim of retaliatory opposition to plaintiff Osburn's request for worker's compensation.

It is further ORDERED that the retaliatory constructive-discharge claim is dismissed as abandoned.

DONE, this the 15th day of September, 2014.

   /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE